IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | : | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Case No.: 25-cr-93 |
| | : | |
| v. | : | |
| **DAJON MALLOY,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

**DEFENDANT'S MOTION TO SUPPRESS**

Defendant Dajon Malloy, through undersigned counsel, respectfully moves this Court to suppress all evidence arising from his seizure, arrest, and search on March 5, 2025. Mr. Malloy was walking westbound in the 100 block of M Street, SW. He was on the way to pick up his young child from school. On the way, Mr. Malloy stopped for ice cream and was eating it while walking down the street. Law enforcement alleges that Mr. Malloy matched the description of a suspect who had earlier abandoned one pound of weed and fled from police. They also allege they observed him committing a civil pedestrian violation when he walked against a do not walk sign. Mr. Malloy's clothes did not match the description of the person sought for a non-violent possessory marijuana investigation, and law enforcement was unable to observe Mr. Malloy while he was in the intersection where they claimed he jaywalked. With no reasonable suspicion that a crime had been committed or that Mr. Malloy was armed and dangerous, the officers seized Mr. Malloy by stopping him on the sidewalk.

Within moments, multiple police vehicles swarmed the area, and he was surrounded. Law enforcement pestered Mr. Malloy which prevented him from continuing to the school to pick up his son. One officer also claimed to see the outline of a gun in the leather bag Mr. Malloy was carrying on his shoulder. Frustrated with the situation, Mr. Malloy emptied out a

bag he was carrying, which included 8 sealed individual bags of marijuana purchased at a retail dispensary. Each package was in its original condition and clearly stated on the outside that it contained 3.5 grams. Undoubtedly, each of the experienced officers on the scene had encountered their packages daily and knew the quantity in each bag. Despite the obvious calculation that eight (8) bags of marijuana containing 3.5 grams each was well under the legal limit of two (2) ounces/56 grams that a person can lawfully possess in the District of Columbia, law enforcement calculated that the amount of marijuana Mr. Malloy possessed "appeared to be greater than the legal amount of 2 ounces or less." Exhibit 1, *Gerstein* Affidavit. While law enforcement was in the process of arresting Mr. Malloy for unlawful possession of marijuana, one of the officers reached into a bag Mr. Malloy was carrying and searched it while it was still on Mr. Malloy's shoulder. A gun was located in the bag.

The seizure, arrest, and search of Mr. Malloy violated his Fourth Amendment rights, as it was performed without a warrant or legal basis. As such, Mr. Malloy moves to suppress all evidence, including any statements he made, arising from the events of March 5, 2025.

## Factual Background

Mr. Malloy is charged with Unlawful Possession of a Firearm by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year in violation of 18 U.S.C.§ 922(g)(1). ECF Dkt No. [ADD]. Mr. Malloy is the father to two young children. On March 5, 2025, he was walking to pick up his older son from school. On the way, he stopped to purchase some ice cream. He was walking down the street, eating the ice cream, and looking forward to seeing his son and spending the rest of the day together. Unbeknownst to Mr. Malloy, a few blocks away, a young black man was under police surveillance. There was an "investigation . . . involving marijuana [where] [s]omeone [was] suspected of having marijuana in an apartment

building." Exhibit 2, March 11, 2025 Preliminary Hearing Tr. At 21. Law enforcement claims that this individual abandoned a pillowcase containing one (1) pound of marijuana and fled. There was no reference to this unknown person being armed. *Id*. at 20. Law enforcement put out an alert for a black male wearing black pants, a black shirt, and a Moose Knuckles jacket. The alert was transmitted to other law enforcement officers in the area. Significant resources were put into trying to locate this unknown black male alleged to have been involved in a non-violent drug offense. Mr. Malloy was not the person they were looking for, nor did he match the description of the suspect.

Law enforcement alleges that while searching the area for the suspect in the Moose Knuckles jacket, they saw Mr. Malloy walking southbound on M Street, SW. It was obvious that Mr. Malloy was not wearing the key article of clothing, a Moose Knuckles Jacket. He was wearing a Moncler jacket with a print identifying it as such. A Moose Knuckles jacket has a distinctive marking that is missing from the jacket Mr. Malloy was wearing.




Law enforcement also claims that Mr. Malloy was "startled by the presence of a uniformed police vehicle . . . and looked at [law enforcement] and gave a deer-in-the-headlights look." Exhibit 3, April 3, 2025 Grand Jury Tr. At 7. MPD Ofc. Timothy Ahl claims that he then observed Mr. Malloy commit a civil infraction, crossing the street against the displayed signal. Notably, at the time Mr. Malloy was crossing the street, Ofc. Ahl was almost a full block away:



When Ofc. Ahl first approached the intersection where he claims to have observed Mr. Malloy committing the traffic infraction, Mr. Malloy is not present in the crosswalk:



By the time Ofc. Ahl reached the intersection, which is next to an MPD station, Mr. Malloy is down on the sidewalk continuing southbound



Law enforcement was not able to observe Mr. Malloy while he was in the crosswalk, and he did not match the description of the person sought for a marijuana investigation. Notwithstanding, a large cadre of law enforcement stopped Mr. Malloy. He was compliant during the encounter. He provided his name and identification to law enforcement. While he was waiting on the sidewalk, more officers arrived and surrounded him. The large police presence made Mr. Malloy uncomfortable. He was also concerned about being late to pick up his son from school. Mr. Malloy's information was confirmed through various databases, and a warrant check came back negative. There was also discussion amongst officers about a bag Mr. Malloy was carrying on his shoulder.

During the encounter, multiple law enforcement officers questioned Mr. Malloy. His frustration continued to mount, but he remained calm and respectful. In response to a question, Mr. Malloy stated that he had marijuana in his bag. He offered to take it out and show it to law enforcement. The marijuana was in the original retail packaging with the weight printed on the outside of each bag:



The total amount of marijuana was below two (2) ounces. While this was happening, Ofc Ahl, who spent most of the encounter in his vehicle, grabbed Mr. Malloy's bag and reached inside:



Inside the bag, law enforcement allegedly found a firearm. Mr. Malloy was placed under arrest. After being taken to the police station, he spoke with law enforcement and made a statement.

## Legal Standard

The Fourth Amendment of the United States Constitution guarantees the right of people to be secure in their persons and protects them against unreasonable searches and seizures by the police. U.S. CONST. Amend IV. Warrantless seizures are presumptively unreasonable. *See Katz v. United States*, 389 U.S. 347, 357 (1967). The Supreme Court has held that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and

well delineated exceptions." *Katz* 389 U.S. at 357 (footnotes omitted). Where the government seeks to introduce evidence seized without a warrant, it carries the burden of showing that the evidence falls within one of the "few specifically established and well delineated exceptions" to the warrant requirement of the Fourth Amendment. *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971); *Katz*, 389 U.S. at 357. Thus, where, as here, police officers act without a warrant, the government has the burden of showing their actions are constitutional under the Fourth Amendment. *United States v. Jeffers*, 342 U.S. 48, 51 (1951); *United States v. Davis*, 997 F.3d 191, 196 (4th Cir. 2021) (internal citations omitted)

     The "central inquiry" for whether a Fourth Amendment violation has occurred is in determining "the reasonableness of the particular governmental invasion of a citizen's personal security." *California v. Hodari D.*, 499 U.S. 621, 636 (1991) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968). To satisfy the Fourth Amendment reasonableness standard, the officer is required to be able to identify "specific and articulable facts" which, when considered with the according rational inferences, "reasonably warrant [the] intrusion." *Terry*, 392 U.S. at 21 (where the defendants' repeated casing of a store was found to be a specific, articulable fact which the officer reasonably relied on in commencing a warrantless search and seizure).

     A person is considered seized when an "officer, by means of physical force or show of authority, terminates or restrains his freedom of movement*." Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal citations and quotation marks omitted). There can still be a seizure where there is "a show of authority and without the use of physical force," so long as "actual submission" on the part of the seized occurs. *Id.* (where defendant's apparent submission to the deputy by remaining idle in his car during a traffic stop was evidence of a seizure by show of authority). When determining whether a seizure by way of a "show of authority" has occurred,

the Supreme Court has historically looked to whether "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Hodari D.*, 499 U.S. at 628 (internal citations and quotation marks omitted). While the Constitution permits seizures in the form of temporary investigative detentions that may not rise to the level of an arrest (*Terry* stops), the specific and articulable facts in question must give rise to the reasonable suspicion that a crime was being committed. *See Terry*, 392 U.S. at 22 ("One general interest is of course that of effective crime prevention and detection; it is this interest which underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.")

## Argument

The evidence in this case must be suppressed as the fruit of the unlawful seizure, search, and arrest of Mr. Malloy. Law enforcement officers had no warrant and insufficient reasonable suspicion to stop Mr. Malloy as he walked down the street eating ice cream. Officers unduly prolonged the encounter of Mr. Malloy, before Ofc. Ahl grabbed a bag Mr. Malloy was carrying and searched it. There was no lawful basis for law enforcement to search Mr. Malloy's bag. Further, there was no probable cause to arrest him for unlawful possession of marijuana or any other offense before he was unlawfully searched. None of the recognized exceptions under the Fourth Amendment that could permit a warrantless search are present. All of the evidence at issue in this case was obtained directly from an unconstitutional search, seizure, and arrest, and therefore should be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (holding that if the evidence has been obtained through the exploitation of a Fourth Amendment violation, the evidence must be suppressed).

**The Seizure of Mr. Malloy Was Unlawful and Unduly Prolonged**

There have been at least two justifications provided for the initial stop and detention of Mr. Malloy. Both strain the realms of credibility. First, Mr. Malloy was alleged to match the description of a suspect in a possessory marijuana investigation. He did not match the description, and this was known before he was stopped. Second, it is alleged that he was jaywalking. Putting aside the absurdity of detaining someone for such an offense, law enforcement was not in a position to observe Mr. Malloy while he was in the crosswalk. Even more curious is the fact that it is alleged that Mr. Malloy illegally crossed the street mere seconds after one of the officers raised the issue. Further, during the relevant time period, there were cars turning from all directions and pedestrians crossing the street north and south, and east and west.

Law enforcement unduly prolonged the seizure of Mr. Malloy. Assuming *arguendo* that there was a basis to detain Mr. Malloy for either crossing the street against a walk signal or based on his matching the description of an alert, the "investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Hutchinson*, 408 F.3d 796, 800 (D.C. Cir. 2005) (citing and quoting *Florida v. Royer*, 460 U.S. 491, 499 (1983). If law enforcement observed Mr. Malloy committing the civil infraction, he should have been issued a ticket and allowed to continue to pick up his child from school. Law enforcement immediately learned that the identity Mr. Malloy provided was accurate. He did not have an outstanding warrant. At that point, there was no basis to continue an investigation into his purported civil infraction. Mr. Malloy should have been issued a ticket and told he was free to go. Instead, law enforcement continued to unlawfully detain Mr. Malloy, which caused him to make statements and take actions, such as removing the marijuana from his bag.

It was obvious when Mr. Malloy was detained that he did not match the description of the individual who allegedly abandoned marijuana.  Communication between the officer who issued the alert and officers who conducted the canvas of the area reveals that they were aware of the emblem associated with that brand.  After it was communicated that Mr. Malloy was wearing a Monler jacket, the alerting officer stated, "it was a Moose Knuckles so that is not going to be him."  Given this conversation, which occurred before Mr. Malloy was stopped, there was no lawful basis to stop Mr. Malloy for an investigation of the abandoned marijuana.

### There Was No Probable Cause to Search or Arrest Mr. Malloy

There was no probable cause to arrest Mr. Malloy for possession of marijuana.  When the government seeks to use the search incident to arrest exception to the Fourth Amendment, "the validity of a search grounded upon that exception depends on the lawfulness of the arrest, which in turn requires probable cause to believe that a crime has been committed."  *United States v. Bookhardt*, 277 F.3d 558, (D.C. Cir. 2002).  Mr. Malloy took marijuana out of his bag, which was in retail packaging.  The total weight was well below the limit of two (2) ounce that an individual can possess.  The weight cited by the government, 2.89 ounces, includes the packaging and marijuana found after Mr. Malloy was arrested.

Office Ahl unlawfully searched the Mr. Malloy's bag.  He did not have a warrant nor any lawful basis to seize the bag and search it.  The claim that an outline of an object consistent with a firearm was observed is belied by the available body worn camera footage and statements by other officers on the scene.  Any items recovered as a result of the unlawful search must be suppressed.

### **Evidence Obtained From the Unlawful Search of Mr. Malloy Must be Suppressed**

The exclusionary rule prevents "the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis v. United States*, 564 U.S. 229, 231–32. The rule applies where the "Government seeks to use such evidence to incriminate. *United States v. Calandra*, 414 U.S. 338, 348 (1974). It serves to suppress both "evidence obtained during illegal police conduct," as well as "evidence that is the indirect product of the illegal police activity." *United States v. Oscar-Torres*, 507 F.3d 224, 227 (4th Cir. 2007). The indirect product doctrine, also known as the "fruit of the poisonous tree," requires the suppression of evidence that was discovered as a result of exploiting the illegal conduct. *Wong Sun*, 371 U.S at 471; *United States v. Terry*, 909 F.3d 716, 720 (4th Cir. 2018) (internal citation omitted) ("defendants may seek to suppress not only evidence obtained as a direct result of an illegal search but also evidence later discovered as a result of that search").

When it is established that the government performed an unlawful search, the "burden is on the government to show that evidence was not obtained as a direct result of the illegal search." *Davis*, 997 F.3d at 196. Here, that burden cannot be met. But for the unlawful seizure of Mr. Malloy, the unlawful search, and his unlawful arrest without probable cause, law enforcement would never have found a handgun on Mr. Malloy. Additionally, any statements made by Mr. Malloy while in police custody, including statements on the sidewalk, would not have occurred. All the evidence against Mr. Malloy arises from the unlawful seizure, search, and arrest, and it must be suppressed.

## Conclusion

Law enforcement unlawfully seized, arrested, and searched Mr. Malloy without a warrant or lawful basis. These actions violated his Fourth Amendment rights, and any evidence and statements obtained because of the violation must be suppressed.

Respectfully Submitted,

/s/
Marc Eisenstein
Coburn Greenbaum & Eisenstein PLLC
1710 Rhode Island Avenue, N.W.
Second Floor
Washington, DC 20036
Phone: (703) 963-7164
Fax: (866) 561-9712
marc@coburngreenbaum.com

*Counsel to Defendant*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on July 3, 2025 a copy of the foregoing was filed with the Clerk of the Court and served on all counsel of record via ECF.

/s/
Marc Eisenstein